Commonwealth v. Franklin.

himself; for, it attainted, he would still be liable (notwithstanding the treaty of peace) to the corruption of blood, under the old state constitution, the treaty of peace not operating as a reversal of the attainder; and no lawyer ever suggested, or would assert, that a man's vote could be rejected, unless he answered questions thus tending to the exposition of his own guilt. 1 Styl. Pr. Rep. 675; 3 Bl. Com. 268, 363–4; Doug. 572; Salk. 153; 4 State Trials, 747. 2d. That it is material, on the present indictment, to prove that the defendant acted with design to influence unduly, or to over-awe the election, or to restrain the freedom of choice : whereas, it is evidently the case of a son interposing, to protect an aged and infirm parent from insult ; and his actions, as well as words, were the mere ebullition of sudden passion.

*Reed* and *Dickerson*, for the commonwealth, admitted that no answer could be exacted, which would expose a man to penal consequences; but they insisted, that the answers to the questions proposed (though in the affirmative) would not, at this day, involve the voter in any jeopardy of life, liberty, property or penalty. The answers could only prove him (if in the affirmative) to be an alien ; and an alien may certainly be compelled to disclose his foreign birth. (Park. 164.) The questions were calculated to ascertain a fact, on which the right to vote depended. None but citizens can vote. Now, although every man (even a native of America) had a right to choose his party in the revolutionary war (1 Dall. 53), yet, if he took an oath of allegiance to Great Britain, or joined her armies, he determined his election ; and in neither of these cases, any more than in the case of an attainder, could he vote at our elections, as a qualified citizen. If, then, the judges of the election acted within the limits of an official discretion, in proposing the questions, the *lifted fist and threatening words of the de- [*255 fendant, bring the case clearly within the description and punishment of the law.

---

COMMONWEALTH *v.* FRANKLIN *et al.*

*Intrusion law.*

The act of 11th April 1795, declaring, as criminal offences, the taking possession of lands, or conspiring to convey, possess or settle them, in the counties of Northampton, &c., under any title not derived from Pennsylvania, is not unconstitutional.

IN August Session 1801 of the Court of Quarter Sessions, the grand jury of Luzerne county presented the following indictment :

Luzerne county, ss.

The Grand Inquest for the body of the county of Luzerne, upon their oaths respectively do present, that John Franklin, Elisha Satterlee and John

Jenkins, all late of the said county, yeomen, on the first day of August, in the year of our Lord, one thousand eight hundred and one, at the county aforesaid, and within the jurisdiction of this court, unlawfully did combine and conspire, for the purpose of conveying, possessing and settling on certain lands within the limits of the county aforesaid, under a certain pretended title not derived from the authority of this commonwealth, or of the late proprietaries of Pennsylvania, before the revolution, to the evil example of all others in like manner offending, contrary to the form of the act of general assembly of this state in such case made and provided, and against the peace and dignity of the commonwealth of Pennsylvania, &c.

And the jurors aforesaid, upon their oaths aforesaid, do further respectively present, that the said John Franklin, Elisha Satterlee, John Jenkins and Joseph Biles, all late of the county aforesaid, yeomen, on the first day of August, in the year of our Lord, one thousand eight hundred and one, at the county aforesaid, did combine and conspire for the purpose of laying out townships, by persons not appointed or acknowledged by the laws of this commonwealth, to the evil example of all others in like manner offending, contrary to the form of the act of assembly of this state in such case made and provided, *and against the peace and dignity of the commonwealth of Pennsylvania.

*256]

JOSEPH B. McKEAN,
Attorney-General.

A *certiorari* issued at the instance of the defendants, to remove the indictment from the quarter sessions into the circuit court ; directed, however, to the judges of the court of common pleas of the county, requiring the return of an indictment against the four persons named in the second count, for both offences ; and actually returned by the associate judges of the common pleas.

On the trial of the indictment, in the circuit court, at a session held at Wilkesbarre, Luzerne county, in May 1802, the jury found a special verdict in these terms :

"And now a jury of the county being called, came, to wit, Thomas Duane, Lazarus Denison, Peter Grubb, John Cary, Nathan Beach, Thomas Wright, Ebenezer Slocum, Nathan Waller, Abel Pierce, Jacob Bedford, Timothy Beebe and Abiel Fellows, who being duly impannelled, elected, sworn and affirmed to try these issues, on their oaths and affirmations, do find, that the defendants, John Franklin and John Jenkins, did, after the 11th of April 1795, at the county of Luzerne, conspire and combine for the purpose of conveying, possessing and settling on lands within the said county, under a pretended title not derived from the authority of this commonwealth, or of the late proprietaries of Pennsylvania, before the revolution, contrary to the form of an act of general assembly of this commonwealth, passed the 11th of April 1795, entitled an act to prevent intrusions on lands within the counties of Northampton, Northumberland and Luzerne. And the jurors aforesaid, on their oaths and affirmations aforesaid, do further find, that the said John Franklin and John Jenkins, after the 11th of April 1795, at the county aforesaid, did conspire and combine for the purpose of laying out townships in the said county of Luzerne, by persons not appointed or acknowledged by the laws of this commonwealth, contrary to the form

Commonwealth v. Franklin.

of the act of the general assembly aforesaid ; but whether the said defendants are guilty in manner and form as they stand indicted, they know not, and pray, therefore, the opinion of the court. And if the court here should be of opinion, that the said act of general assembly is not contrary to the constitution of the United States, or of the state of Pennsylvania, then they find the said defendants guilty in manner and form as they stand indicted, but if the court should be of opinion that the said act of general assembly is contrary to the constitution of the United States, or of the state of Pennsylvania, then they find the said *defendants not guilty in manner [*257 and form as they stand indicted. And the said Elisha Satterlee and Joseph Biles, they find not guilty, in manner and form as they stand indicted."

Upon this finding of the jury, the defendant filed the following reasons in arrest of judgment.

1st. The law on which this indictment is grounded, is unconstitutional.

2d. The offences charged are not described with convenient and legal certainty.

3d. No act is stated, in either count, to have been committed in pursuance of the combination and conspiracy.

4th. Two different crimes are charged in the first count of the indictment.

5th. It is not stated in the second count, that the combination and conspiracy was to lay out townships within Luzerne county, or elsewhere, nor are the townships in any wise described.

6th. The cause was never pending in the circuit court.

7th. The *certiorari* is to remove an indictment against four persons, for two offences ; and there is no such indictment.(*a*)

The act of assembly, to which the indictment and proceedings refer was passed on the 11th of April 1795 (3 Dall. Laws, 703), and the sections material, in the present case, were the following :

Sect. 1. "That if any person shall, after the passing of this act, take possession of, enter, intrude, or settle on any lands, within the limits of the counties of Northampton, Northumberland or Luzerne, by virtue or under color of any conveyance of half-share right, or any other pretended title, not derived from the authority of this commonwealth, or of the late proprietaries of Pennsylvania, before the revolution, such person, upon being duly convicted thereof, upon indictment in any court of oyer and terminer, or court of general quarter sessions, to be held in the proper county, shall forfeit and pay the sum of two hundred dollars, one-half to the use of the county, and the other half to the use of the informer; and shall also be subject to such imprisonment, not exceeding twelve months, as the court before whom such conviction is had, may, in their discretion, direct.

---

(*a*) The 6th and 7th exeeptions were filed, at a subsequent stage of the cause, after the 1st exception had been overruled.

[1] The case was tried before Judges YEATES and BRACKENRIDGE, who differed in opinion as to the constitutionality of the intrusion law, but both concurred in submitting that question to the jury, which resulted in the special verdict. The court being divided, no judgment was given in the circuit court, but the question of the constitutionality of the intrusion law, and all others arising on the motion in arrest of judgment, were reserved for the supreme court *in banc.* 2 Am. Law J. 287. From the Luzerne Federalist of the 10th May 1802.

Sect. 2. "That every person who shall combine or conspire for the purpose of conveying, possessing, or settling on any lands within the *limits aforesaid, under any half-share right, or pretended title as aforesaid, or for the purpose of laying out townships by persons not appointed or acknowledged by the laws of this commonwealth, and every person that shall be accessary thereto, before or after the fact, shall, for every such offence, forfeit and pay a sum not less than five hundred, nor more than one thousand dollars, one-half to the use of the county, and the other half to the use of the informer; and shall also be subject to such imprisonment at hard labor, not exceeding eighteen months, as the court in their discretion may direct."

It was agreed by the attorney-general, and the counsel for the defendants, that the leading question, whether the act of assembly was constitutional, or not, should be argued in the supreme court, before all the judges. Notice was regularly given to the attorney of the defendants, that the case would be argued at the present term ; but they did not appear, nor apply to counsel to appear for them, until the argument had actually commenced ; and then, upon being refused a term's delay, their counsel (*Lewis*), for want of preparation, declined entering into the discussion.

The case was opened and argued, by *Duncan*, for the commonwealth. He traced the history of the Wyoming controversy, and referred to the decree of Trenton (30th December 1782, 8 vol. Journ. Cong. 83–4), as finally terminating the question of boundary and jurisdiction between the states of Pennsylvania and Connecticut, in favor of the former.    From that period, every settler under a Connecticut title, must be regarded as a wilful trespasser. (2 Dall. 306.)    The ordinary process of the law, however, was not sufficient to restrain or repel the intrusions upon our territory ; the legislative attention was imperiously drawn to the subject ; and an act was passed, on the 11th of April 1795, to punish, as criminal offences, the taking possession of lands, or conspiring to convey, possess or settle them, in the counties of Northampton, Northumberland or Luzerne, under any title not derived from Pennsylvania.    (3 Dall. Laws, 703.)    Upon the first and second sections of this act, the present indictment is founded ; and a constitutional objection is raised, to quash the indictment, and defeat the beneficial operation of the act.    This constitutional objection has, on other occasions, been branched into various points.

1. The act has been said to be a violation of the first section of the ninth article of the state constitution, which declares, "that all men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."

*We answer, property is a creature of society ; and the right, in all its modifications, of acquisition, possession and transfer, is regulated by positive law.    (2 Bl. Com. 2 ; 3 Dall. 391, 394.)    From the very nature of the right of property, it is a perfect and exclusive right.    The moment that it was established, that the boundaries of Pennsylvania embraced the Wyoming district of country, the right of property became absolute and exclusive in the state ; it would be absurd, to suppose, that Connecticut

Commonwealth v. Franklin.

could also possess an exclusive right of property in the same land ; and yet, without such a supposition, by what principle of general law, what positive statute, what express or implied contract, can her grants confer a possessory or usufructuary interest in the land ?   No man could obtain from Connecticut a legitimate right to acquire, possess and protect property, which belonged to Pennsylvania ; and the constitution could only intend to recognise and sanction a legitimate right for those purposes.

2. The act has been said to be a violation of the constitutions of the United States and of Pennsylvania, inasmuch as it creates a new offence ; punishes *ex post facto*, the exercise of a claim, legal in its origin ; and impairs the obligation of contracts.

We answer, the intrusion, forcible or clandestine, upon the territory of a sovereign power, is an offence *malum in se*.   It is an attack, not only upon the national property, but upon the national sovereignty.   If done by individual citizens of another state, it is a high misdemeanor ; and if done with the sanction of their government, it would be a just cause of war.   But it is adding insult to outrage, when the citizens of the state itself, deny her right and authority, and parcel out her lands under the authority of another government.   The offence is flagrant, against every principle of political economy ; and always has been held indictable.   (2 Hawk. P. C. 210 ; 4 Bl. Com. 128; 32 Hen. VIII., c. 9.)   Long, however, before the Connecticut claim began to operate, Pennsylvania (in 1729–30) had introduced a similar law, to prevent purchases of land from the Indians ; to annul all contracts for that purpose ; and to extend the English statutes of forcible entries and detainers, to the case of entry upon lands, not located or surveyed by some warrant or order from the proprietary.   (1 Dall. Laws, 248.)   And even in the year 1700 (which law was enforced by additional sanctions, in 1769, Ibid. 503), it had been declared, " that if any person presume to buy any land of the natives, within the limits of this province and territories, without leave from the proprietary thereof, every such bargain or purchase shall be void, and of no effect."   (Ibid. 5.)   Say, then, that the Connecticut title originated in July, 1754 (as it is alleged), in a purchase from the Indians : by a positive subsisting law, the purchase was void; it could afford no lawful ground for subsequent contracts ; and of course, no *contract could, [*260 in this point of view, be impaired by the act against intrusions.   Say, that the contract is only to be regarded as between Connecticut and her grantees : the contract is neither annulled nor impaired, if the subject of it belonged to Connecticut ; but surely a contract with Connecticut could give no right to enter upon lands that belonged to Pennsylvania.   The obligation of the contract lies exclusively upon Connecticut ; and Pennsylvania does not, in any degree, impair it, when she merely says, that it shall not be forcibly transferred to her.   If, therefore, Pennsylvania had a right to legislate for the protection of her property, for the vindication of her sovereignty, is there in the manner of legislating, any violation of a constitutional or established principle of jurisprudence?   No, the offence is defined, and the punishment prescribed, not *ex post facto*, in reference to past intrusions and conspiracies ; but expressly contemplating those which shall occur, after the enacting of the law.

3. The act has been said to be a violation of the state constitution (art. ix., § 1), by destroying an equality of rights ; inasmuch as its provisions

do not apply to the whole state, but to a particular district, composed of three counties.

We answer, the grievance is local, and the remedy ought, therefore, to be locally applied. The usurpation and intrusion prevailed only in the counties of Northampton, Northumberland and Luzerne; and the proceeding against the intruders, by eviction and restitution, is not a novelty in our law. In criminal cases, the award of restitution always follows a conviction; and in cases of forcible entry and detainer (when, too, the public dignity is not involved), restitution is the appropriate execution of the judgment, in favor of a prosecutor.

4. The act has been said to be a violation of the constitution, because it destroys or suspends the right of entry.

We answer, it cannot be seriously supported, as a legal proposition, that it is unconstitutional to deny a right of entry on lands in one state, under an authority derived from the government of another state. Even as to estates derived from herself, or as to estates belonging to her citizens, the state may, and positively does, by an act of limitation, destroy the right of entry. (2 Dall. Laws, 281–2.) But the act of assembly, in discussion, if fairly construed, does not effect a right of entry, to prevent the bar of the act of limitation, or to seal a lease, for the purpose of intruding and settling upon the lands, in pursuance of the spurious title of Connecticut.

5. The act has been said to be a violation of the state constitution, because it exercises a power, in its nature judicial, and not legislative.

*261]  *We answer, the act neither undertakes to investigate facts nor to pronounce a judgment. It prohibitst he doing of certain acts; and if the acts are done, it leaves to the court of justice, the exclusive province of trying and deciding upon the case.

6. The act is said to be a violation of the second section of the third article of the constitution of the United States, so far as it provides, that the judicial power shall extend to controversies between citizens of the same state claiming lands under grants of different states.

We answer, the federal courts have no criminal jurisdiction, except in the cases expressly authorized by the constitution and laws of the United States; and the present case, considered as a criminal one, is clearly not included in the delegated authority of the constitution or laws. Considered as a civil case, it is necessary, for the claim of federal cognisance, to show that Connecticut had actually issued grants for the lands granted by Pennsylvania, which has never yet been pretended. For the 9th article of the confederation had taken cognisance of "all controversies concerning the private right of soil, claimed under different grants of two or more states, whose jurisdiction, as they may respect such lands and the states which passed such grants, are adjusted, the said grants, or either of them, being at the same time claimed to have originated antecedent to such settlement or jurisdiction." And the existing federal constitution also calls, expressly, for a claim of lands, under grants of different states, before the case of federal cognisance can arise. That the word "grant" is thus used in its legal, technical, sense (2 Bl. Com. 317), and that no such grant was ever made by Connecticut, prior to the decree of Trenton, will satisfactorily appear from the journals of congress. (8 vol. 74; 9 vol. 156; 10 vol. 294–9.) After all, the constitution of the United States only secures the right of action, which may subsist without

the right of entry, and is not destroyed or impaired by the act of assembly—an act of public police, for the purposes of internal self-government.

*Dallas*, in concluding for the commonwealth, divided the consideration of the general question (whether the act was constitutional?) into an inquiry—1st. Whether the subject of the law, was constitutionally proper? And 2d. Whether there was any departure from constitutional principles, in that regulations, for carrying the law into effect?

1. It is the duty of every government to protect the rights of property, and to preserve the public peace. An evil subversive of those rights, fatal to that peace, existed in Pennsylvania at the period of passing the act. The state laws, then in force, were incompetent to a cure of the evil. The federal government could not interpose, either with its legislative or [*262 judicial power. And *unless the state could administer to her own relief, the case was desperate and dreadful.

What was the evil that existed? By the decree of Trenton, it was settled, that Pennsylvania had the exclusive right of sovereignty, soil and pre-emption, as to the lands in question ; by a retrospective recognition of the boundaries described in the charter from Charles II. to William Penn. The laws of Pennsylvania must, therefore, be applied to every transaction respecting those lands ; and in the years 1700 and 1729, it had been made unlawful to purchase any part of them from the Indians. (1 Dall. Laws, 5, 248.) Yet, in July 1754, the Susquehanna and Delaware companies, in defiance of the laws, made a purchase from the Indians ; and without a grant from Connecticut, or a grant from Pennsylvania, but merely under color of a grant from the Indians (which the acts of assembly declared to be null and void), they, and persons succeeding to their pretensions, have continued, from that time to the present, to annoy the peace, and to insult the government of Pennsylvania, by the most flagrant acts of outrage, usurpation and contumacy ; insomuch that even an attempt was made to erect an independent state within her territory. (2 Dall. Laws, 82.) Reviewing, however, the transactions only subsequent to the final decree of Trenton (30th December 1782), we find, that the district of country, called the Seventeen Townships, was all that the Connecticut claimants then occupied. But still, as Pennsylvania had previously issued grants for the same land, she was bound to sustain the rights of her grantees. Every pacific and conciliatory instrument was employed for that purpose, before the state resorted to force or to denunciation. Commissioners were appointed to negotiate a compromise between the adverse claimants : and an act was passed on the 13th of March 1783, to suspend all process against the Wyoming settlers, during the negotiation (P. L. 146); but the commissioners were spurned, baffled and defeated ; and the suspending law was repealed, on the 9th of September 1783, because it was evident, that the clemency and moderation of the legislature "had been mistaken and treated with neglect." (P. L. 197.) The spirit of conciliation was, nevertheless, indulged much longer. An act was passed on the 15th of September 1784, " for the more speedy restoring the possession of certain messuages, lands and tenements in Northumberland county, to the persons who lately held the same," and had been violently evicted. (P. L. 391.) An act of oblivion and pardon was also passed, on the 24th of December 1785, as to all crimes

Commonwealth v. Franklin.

and offences committed on or before the 1st of November preceding, under color of the Wyoming controversy ; but the supreme executive council was, at the same time, authorized, to employ a competent body of the militia, in support of the magistrates. To gratify the inhabitants, a part of North-umberland *was erected into a new county, and called Luzerne, on *263] the 25th of September 1786. (2 Dall. Laws, 465, 486.) But the great effort for the restoration of harmony and order, was the act, usually styled " the confirming law," passed on the 28th of March 1787. This act recites, that " the interfering claims have occasioned much contention, expense and bloodshed ; and the assembly being desirous of putting an end to those evils, by confirming such of the Connecticut claims as were acquired by actual settlers prior to the termination of the dispute (by the decree of Trenton), agreeable to the petition of a number of the said settlers, and by granting a just compensation to the Pennsylvania claimants." Commissioners were again appointed for carrying the confirming law into effect ; but " when they met, in pursuance of the law, they were interrupted in their proceedings by the combinations, threatenings and outrageous violence of certain lawless people in the county of Luzerne, and obliged to fly for the preservation of their lives ;" aided by persons who were severely wounded on the occasion. The confirming law was thereupon suspended (29th March 1788, P. L. 450, 530) ; and afterwards, on the 1st of April 1790, it was condemned and repealed, as unjust and unconstitutional. (2 Dall. Laws, 786.) During this period of legislative patience and conciliation, it is matter of public notoriety, that every pacific overture was contemned ; every coercive measure was resisted or evaded ; the powers of government were taken into the hands of voluntary associations of individuals ; the sheriffs and other public officers, were menaced and defied ; the commissioners of the government were insulted, assaulted and imprisoned ; the Pennsylvania claimants were waylaid and murdered ; the number of intruders was daily augmented ; and the extent of their encroachments was indefinitely enlarged.

For the magnitude of this evil, did the laws in force furnish an adequate remedy ? The Connecticut claim was now spread over the whole country, extending beyond the original seventeen townships, throughout the north-western boundary of the state. Where the land was actually occupied by a Connecticut claimant, no Pennsylvania patentee could safely enter : and the danger increased, if the possession was vacant. The process of ejectment, or forcible entry and detainer, or any other civil process, was not effectual to give to the right of property, protection and enjoyment ; and even the force of the militia had failed. The evil was an intrusion upon lands (not to try a title, not to submit to the dispensations of the judicial power, but) to seize, possess and hold by force, violence and terror. There was no law in existence that could afford a remedy ; and yet, there is no man who will contend, that a remedy ought not to be provided.

*Could the federal government afford an adequate remedy ? *264] The case was not within their legislative or executive powers, either expressly, or as an incident to an express power. It is a case of domestic violence ; as to which the federal government can only interfere, " on application of the state legislature, or of the executive, when the legislature cannot be convened." (Const. U. S., art. IV., § 4.) Nor could the judicial power of the United States afford relief. It provides, indeed,

Commonwealth v. Franklin.

for a suit between citizens, claiming grants under different states; but it no-where provides, for prosecutions by a state against its own citizens, committing offences against her municipal laws. (Ibid. art. III., § 2, Amendments; Acts Congress, 3 vol. 131 ; 1 vol. 53, § 9 ; Ibid. 55, § 11 ; Ibid. 57, § 12 ; Ibid. 58, § 13.) In *Commonwealth* v. *Cobbett*, 3 Dall. 467, the principle was discussed and settled ; and in *Rush* v. *Cobbett*, the jurisdiction of the federal courts was adjudged to apply only to cases of contract ; and not to a case of damages for a libel.

The competency of the state government to redress the evil, is a necessary inference from the incompetency of any other power, known to our constitutions and laws, unless it is expressly prohibited. Now, it is not expressly prohibited ; and it cannot, by any act of perversion, be assimilated to an attainder law ; to an *ex post facto* law ; or to a law impairing the obligation of contracts. Nor is it a legislative encroachment upon the judicial department. It decides no question of personal guilt ; it inflicts no punishment ; it merely declares in this, as in every instance of the penal code, what shall constitute an offence, and how the offender shall be punished.

2. Having thus vindicated the subject of the law, from the imputation of being unconstitutional, it is next to be examined, whether there is any departure from constitutional principles, in the regulations for carrying it into effect.

In the construction of a remedial statute, the previous mischief is to be considered. Here, the act of assembly describes the offence, in the very terms of the mischief : 1st. "Taking possession of, entering, intruding or settling on lands, &c., by virtue, or under color of any conveyance of half-share right, or other pretended title, not derived from the authority of this commonwealth, &c." And 2d. "Conspiring for the purpose of conveying, possessing or settling on any lands, within the limits aforesaid, under any half-share right, or pretended title as aforesaid ; or for the purpose of laying out townships, by persons not entitled or acknowledged by the laws of this commonwealth." If the description of the offence contains nothing unconstitutional, does the nature of the punishment? No, it is fine and imprisonment ; and the offender is to be removed from the premises, of which he was tortiously and unlawfully possessed, after full notice of the law, by proclamation and publishing *in court. (3 Dall. Laws, 703, [*265 § 1, 2, 3, 6.) This proceeding by indictment, and the expulsion upon conviction, are said, however, to destroy the right of entry, upon which alone the civil remedy of ejectment can be pursued. But the law contemplates no such entry, in the description of the offence ; for, let it be repeated, it is a tortious entry to hold by force ; and not a lawful entry, to try a right, that the legislature condemns and punishes.

After advisement and deliberation, the judges delivered their opinions, seriatim.

SHIPPEN, Chief Justice, YEATES and SMITH, Justices, concurred in declaring, that the act of assembly, on which the indictment is founded, was constitutional, in all its relations.

BRACKENRIDGE, Justice.—The second count in the indictment is founded upon the second section of the act of assembly ; and the special verdict

finds expressly, that the defendants did conspire for the purpose mentioned in that section. The purpose was, "to lay out townships in the county of Luzerne, by persons not appointed or acknowledged by the laws of this commonwealth." Now, the term township indicates a local jurisdiction, for objects of local police, with powers and officers to effectuate the jurisdiction; and a conspiracy by individuals to erect such townships, is an encroachment upon the rights and authority of the state. It is an offence indictable at common law; and the legislature, with a view more effectually to prevent its commission, had an unquestionable power to increase the punishment.

As to the first section of the act of assembly, I am not prepared to pronounce, that it is unconstitutional; and, consequently, I could not, even on that ground, decide, at present, to arrest the judgment. But it is enough, to observe, that, on the finding of the jury, I shall be ready to give judgment for the commonwealth, on the second count of the indictment, when the subject is brought before us in the circuit court.(a)

---

**\*266]**                    **\*MARCH TERM, 1803.**

---

(a) The cause was argued upon the other objections in arrest of judgment, before the supreme court, in December term 1804. See *post*, p. 316.

